# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                          )
ADIB AHMED,                 )
                          )
              Plaintiff,    )
      v.                  )
                          )    Civil Action No. 25-1351 (RBW)
KRISTI NOEM,            )
in her official capacity as    )
Secretary of the United States  )
Department of Homeland Security, et al., )
                          )
             Defendants.  )
_____)

## MEMORANDUM OPINION

On May 4, 2025, the plaintiff—Adib Ahmed, a citizen of Bangladesh who originally entered the United States on an F-1 student visa—initiated this civil action against the defendants—Kristi Noem, in her official capacity as Secretary of the United States Department Homeland Security ("DHS"); Todd Lyons, in his official capacity as Acting Director of Immigration and Customs Enforcement ("ICE"); and the United States Department of Homeland Security ("DHS")—asserting violations of (1) the Administrative Procedure Act ("APA"), 5 U.S.C. §706(2)(A), alleging arbitrary and capricious agency action, see Complaint for Declaratory and Injunctive Relief ("Compl.") ¶¶ 84–87, ECF No. 1, and ultra vires, procedurally invalid action, see id. ¶¶ 88–92; and (2) the Due Process Clause of the Fifth Amendment to the United States Constitution ("the Fifth Amendment"), see id. ¶¶ 93–98, based on his claim that he was deprived "of protected interests without notice or a meaningful opportunity to be heard[,]"

id. ¶ 93.  Pending resolution by the Court is the plaintiff's motion for a preliminary injunction.[1]
See Plaintiff[']s Application for a Temporary Restraining Order or Alternatively for a
Preliminary Injunction ("Pl.'s Mot.") at 1, ECF No. 4; see also Supplemental Brief in Support of
Plaintiff's Motion for Preliminary Injunction ("Pl.'s Suppl. Br.") at 1, ECF No. 8.  After
carefully considering the parties' submissions and oral arguments made during both the May 23,
2025, motion hearing and the August 1, 2025, status conference,[2] the Court concludes for the
following reasons that it must grant in part and deny in part the plaintiff's motion for a
preliminary injunction.

## I.      BACKGROUND

To reiterate, the plaintiff brings this civil action against the defendants, asserting
violations of the APA and the Fifth Amendment.  See Compl. ¶ 3.  The plaintiff seeks
"declaratory and injunctive relief to prevent further harm and to restore the lawful status
that[, he alleges,] was wrongfully stripped away from him."  Id. ¶ 4.  In his motion for a
preliminary injunction, the plaintiff requests that the Court grant him various forms of relief,
including, inter alia, (1) ordering the defendants to "immediately and fully reinstate

---

[1] In the plaintiff's reply to the defendants' opposition to his supplemental brief in support of his motion, he
"respectfully requests that the Court convert the [t]emporary [r]estraining [o]rder into a [p]reliminary [i]njunction to
prevent further irreparable harm while the Court considers this matter on the merits."  Supplemental Brief in Support
of Plaintiff's Motion for Preliminary Injunction ("Pl.'s Suppl. Br.") at 13, ECF No. 8.  Therefore, the Court will
refer to the plaintiff's motion as one for a preliminary injunction throughout this Memorandum Opinion.

[2] In addition to the filings already identified, the Court considered the following submissions in rendering its
decision: (1) the Memorandum of Law in Support of Plaintiff[']s Application for a Temporary Restraining Order or
Alternatively for a Preliminary Injunction ("Pl.'s Mem."), ECF No. 4-1; (2) the Defendant[s'] Opposition to
Plaintiff's Motion for a [Temporary] Restraining Order or, Alternatively, for a Preliminary Injunction ("Defs.'
Opp'n"), ECF No. 6; (3) the Defendant[s'] Opposition to Plaintiff's Motion for a Preliminary Injunction (Defs.'
Suppl. Opp'n"), ECF No. 9; (4) the Plaintiff's Reply to Defendant[s'] Opposition to Plaintiff's Motion for a
Preliminary Injunction ("Pl.'s Suppl. Reply"), ECF No. 10; (5) the plaintiff's Notice of Supplemental Authority
("Pl.'s Notice"), ECF No. 11; (6) the plaintiff's Notice of Supplemental Facts ("Pl.'s Suppl. Facts"), ECF No. 13;
and (7) the Defendants' Response to Plaintiff's Notice of Supplemental Facts ("Defs.' Resp. to Pl.'s Suppl. Facts"),
ECF No. 14.

[the plaintiff's Student Exchange Visitor Information System (SEVIS)] record, retroactive to the date of termination[,]" Pl.'s Mot. at 2; (2) declaring that the defendants' "prior termination of [the p]laintiff's SEVIS record shall have no legal effect and shall not interfere with his ability to pursue work authorization, maintain lawful presence [in the United States], or apply for any other immigration benefit associated with F-1 status[,]" id.; (3) enjoining the defendants "from terminating [the p]laintiff's SEVIS record during the pendency of this litigation[,]" id. at 3; and (4) "prohibit[ing]" the defendants "from detaining [the p]laintiff, initiating removal proceedings, or taking any adverse immigration enforcement action against him based on the prior SEVIS termination[,]" id.

## A.    Statutory Background

Pursuant to the Immigration and Nationality Act ("INA"), a foreign, nonimmigrant student may enter the United States to pursue a course of study at an approved educational institution. See 8 U.S.C. § 1101(a)(15)(F)(i); 8 C.F.R. § 214.2(f). Prospective students must first seek approval to enter the United States on an F-1 visa,[3] and if approved, the Department of State will issue such a visa to the student, which will permit the student to enter the United States to pursue their course of study. See 22 C.F.R. § 41.61(b)(1). Once admitted, DHS can administratively designate the student as having an F-1 nonimmigrant classification. See 8 C.F.R. § 214.1(a)(2).[4]

---

[3] An F-1 visa authorizes a noncitizen student to enter the United Sates, but it does not govern a noncitizen student's lawful status while in this country. Congress requires those with F-1 visas to be "bona fide student[s]" and "to [either] pursue a full course of study" while in the United States, 8 U.S.C. § 1101(a)(15)(F)(i), or "engag[e] in authorized practical training[,]" 8 C.F.R. § 214.2(f)(5)(i).

[4] A crucial component to admission as an F-1 nonimmigrant student is the presentment of Form I-20, which is "issued in the student's name by a school certified by the Student and Exchange Visitor Program (SEVP) for attendance by F-1 foreign students[.]" 8 C.F.R. § 214.2(f)(1)(i)(A). Form I-20 is endorsed by a Designated School Official (DSO) and the noncitizen student upon the student's entry into the United States, see "Students and the Form I-20," U.S. Dep't of Homeland Sec., https://perma.cc/WH4Y-XFLG, and the student is responsible for

(continued . . .)

An F-1 student may remain in the United States for the duration of their studies so long as they continue to meet the requirements outlined in the regulations governing their status. See 8 C.F.R. § 214.2(f)(5)(i) ("Duration of status is defined as the time during which an F–1 student is pursuing a full course of study at an educational institution certified by [the Student and Exchange Visitor Program (']SEVP[')] for attendance by foreign students"). If a student "fails to maintain a full course of study without the approval of the Designated School Official ('DSO') or otherwise fails to maintain status," the student must leave the United States immediately or seek reinstatement. See 8 C.F.R. § 214.2(f)(5)(iv); see also 8 U.S.C. § 1184(a)(1).

The F-1 visa system governs a nonimmigrant student's legal status, and that system is administered by ICE through its SEVP. Fang v. Dir. U.S. Immigr. & Customs Enf't, 935 F.3d 172, 175 (3d Cir. 2019). And, SEVIS is an SEVP-managed internet system that tracks and maintains information on nonimmigrant students. See 8 C.F.R. § 214.3(a)(1). As part of its implementation of the F-1 visa program, SEVP certifies participating educational institutions and allows those institutions to issue Form I-20 records on students' behalf in SEVIS. See 8 C.F.R. § 214.3(k). SEVP regulations also govern F-1 student status terminations in SEVIS. See 8 C.F.R. § 214.2(f). A student may fall out of compliance with the requirements for F-1 status: (1) by failing to meet the regulatory requirements for F-1 status or (2) through an agency related termination of status. See 8 C.F.R. §§ 214.1(d), 214.2(f)(5)(iv). Termination is a consequence for non-compliance.

---

(. . . continued)
"retain[ing] for safekeeping the initial Form I-20 or successor form bearing the admission number and any subsequent Form I-20 issued to them[,]" 8 C.F.R. § 214.2(f)(2).

DHS can terminate an F-1 student's status in three ways: (1) by revoking a previously authorized waiver under 8 U.S.C. § 1182(d)(3) or § 1182(d)(4); (2) through the introduction of a private bill in Congress to confer permanent resident status; or (3) if DHS publishes a notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons.  See 8 C.F.R. § 214.1(d).[5]  And, DHS's ability to terminate an F-1 student's status is limited to the three paths enumerated in Section 214.1(d).  See Fang, 935 F.3d at 185 n.100.

ICE maintains and manages the SEVIS database in order to track compliance by noncitizen students with the terms of their visa status.  See Privacy Act of 1974; System of Records, 86 Fed. Reg. 69,663 (Dec. 8, 2021).  A student whose SEVIS record is terminated may face various consequences, including: (1) the loss of all on-campus or off-campus employment authorization; (2) the inability to reenter the United States with the terminated SEVIS record; (3) being subject to investigation by ICE agents to confirm whether the student has left the United States; and (4) the termination of any associated F-2 or M-2 records.  See Terminate a Student, U.S. Dep't of Homeland Sec. (Nov. 7, 2024), https://perma.cc/5K2T-2JXD.  And, "there is 'no grace period' for 'duration of status': 'If the student and dependents are still in the United States, the student must either apply for reinstatement,[6] or the student and dependents must leave the United States immediately.'"  Sultan v. Trump, No. 25-cv-1121 (TSC), 2025 WL 1207071

---

[5] This has also been explained differently by another member of this Court as follows: "DHS can terminate a noncitizen's F-1 legal status in one of two ways: (1) student-initiated failure; (2) an agency-initiated termination." Sultan v. Trump, No. 25-cv-1121 (TSC), 2025 WL 1207071 (D.D.C. Apr. 24, 2025) at *3.  The first avenue— student-initiated failure—occurs when a noncitizen student engages in some form of unauthorized employment, see 8 C.F.R. § 214.1(e); provides misleading information to DHS, see id. § 214.1(f); or is convicted of a "crime of violence" carrying a potential sentence exceeding one year in duration, see id. § 214.1(g).  The second avenue— agency-initiated termination—can occur when a waiver that was previously granted under Section 212(d)(3) or (4) of the INA, 8 U.S.C.A. § 1182, is revoked; a private bill is introduced to Congress that would confer to the student lawful permanent residence; or DHS issues a notification in the Federal Register indicating reasons for termination based on national security, diplomatic, or public safety concerns.  See id. § 214.1(d).

[6] Here, the plaintiff represents that he "attempted to resolve the SEVIS termination directly with [the d]efendants before seeking judicial intervention[,]" and that "[i]t was only after those efforts were rejected that [the p]laintiff turned to this Court."  Pl.'s Suppl. Reply at 8.

(D.D.C. Apr. 24, 2025) at *3 (quoting <u>Terminate a Student</u>, U.S. Dep't of Homeland Sec. (Nov. 7, 2024), https://perma.cc/5K2T-2JXD) (footnote added).  On April 26, 2025, ICE issued a new SEVIS termination policy.  <u>See</u> Compl., Exhibit ("Ex.") D (April 26, 2025, SEVIS Termination Policy) ("Apr. 26, 2025, ICE Policy") at 1, ECF No. 1-4.  That policy designated several reasons why a SEVIS record can be terminated, including, as applicable here, "U.S. Department of State Visa Revocation (Effective Immediately)."  <u>Id.</u> at 2.  Importantly, "[t]he Secretary of State has wide latitude to refuse entry or deport noncitizens if he [or she] has 'reasonable grounds to believe' that their presence or activities 'would have potentially serious adverse foreign policy consequences for the United States.'"  <u>Sultan</u>, 2025 WL 1207071, at *3 (quoting 8 U.S.C. § 1227(a)(4)(C)(i)).

### B.    Factual Background

The plaintiff "is a citizen of Bangladesh."  Compl. ¶ 51.  "In July 2022, he lawfully entered the United States pursuant to F-1 status to pursue a Master's degree in Quantitative Risk Analysis and Management at [Georgia State University ('GSU')]."  <u>Id.</u>  While the plaintiff was enrolled at GSU, he "worked as a Graduate Research Assistant" and was subsequently authorized to engage in Curricular Practical Training ("CPT") with the "Research & Evaluation Group[.]"  <u>Id.</u> ¶ 54.  Then, "[a]fter completing his degree in January 2024, [the plaintiff] transitioned to [Optional Practical Training ('OPT')] and remained employed with the same company."  <u>Id.</u>[7]  Early this year, the plaintiff  "commenced employment with two companies under valid [Science, Technology, Engineering, and Mathematics (']STEM[')] OPT authorization . . . .  Both positions were directly related to his field of study."  <u>Id.</u> ¶ 55.

---

[7] According to the plaintiff, "F-1 students may also engage in employment through [CPT and OPT], as authorized by 8 C.F.R. § 214.2(f)(10).  CPT must be part of a student's academic program and requires school authorization, while OPT allows for practical work experience before or after graduation and requires approval by the U.S. Citizenship and Immigration Service (USCIS), a component of DHS.  <u>See</u> § 214.2(f)(10)(i)-(ii)."  Compl. ¶ 14.

The plaintiff acknowledges that in 2023, he "was involved in a domestic incident with his spouse where he [contends that he] inadvertently struck his wife in the nose." Id. ¶ 56.  He states that he "called 911 to request medical assistance and was arrested by responding officers." Id. ¶ 57.  The plaintiff represents that he subsequently "took a negotiated plea to simple assault under Georgia's First Offender Act.  He was ordered to serve [eleven] months and [twenty-nine] days of probation and successfully completed a court-ordered Family Violence Intervention Program. Upon successful completion, [he initially] expected [his case] to be dismissed and the record expunged under Georgia law." Id. ¶ 58.[8]  That has since come to pass.

In regards to the plaintiff's SEVIS record, he represents that "[o]n April 7, 2025, [he] was notified [via email] by GSU's [Designated School Official ('DSO')] that his SEVIS record had been terminated on April 4, 2025." Id. ¶ 59.  The plaintiff asserts that "[t]he reason provided for the termination was 'Otherwise Failing to Maintain Status, Individual identified in criminal records check and/or has had their VISA revoked.'" Id. ¶ 60.  The plaintiff also claims that he "later discovered that his F-1 visa had been revoked by the U.S. Department of State on March 22, 2025[,]" and that he "received no advance notice or explanation regarding the visa revocation or the SEVIS termination." Id. ¶¶ 61–62.  The plaintiff also asserts that, "on April 26, 2025, ICE issued a new SEVIS policy . . . [that includes] categories that were not previously recognized as lawful bases for termination by [the] SEVP." Pl.'s Mem. at 8 (comparing Compl., Ex. D (Apr.

---

[8] On June 4, 2025, the plaintiff filed a Notice of Supplemental Facts, in which he represents that, "[o]n May 29, 2025, the Superior Court of Fulton County, Georgia issued an Order of Discharge and an Amended Successful Termination of Probation Order." Pl.'s Suppl. Facts at 1.  He further represetes that "[t]hese orders confirm that [the p]laintiff successfully completed probation under Georgia's First Offender Act for a plea to simple assault and that he has been fully discharged without an adjudication of guilt." Id.

26, 2025, ICE Policy) at 1, <u>with</u> Pl.'s Mot., Ex. 11 (SEVIS Termination Grounds) at 1, ECF No.

4-11).[9]

The plaintiff further represents that, preceding the termination of his SEVIS record by the

defendants, "[b]eginning on March 31, 2025, [he] was subject to repeated contact, surveillance,

and intimidation by Special Agent Andrew Grentz of DHS's Homeland Security Investigations

(HSI), who also contacted GSU and [the p]laintiff's employer[.]"  Compl. ¶ 63.  Then, "[o]n

March 31, 2025, three HSI agents entered [the p]laintiff's gated apartment complex . . . and

attempted to contact [the p]laintiff at his residence."  <u>Id.</u> ¶ 64.  The plaintiff also received a call

from Agent Grentz regarding forms the plaintiff needed to sign later that day.  <u>See id.</u> ¶ 65.  And,

"[o]n April 4, 2025, [Agent] Grentz returned with others at 4:00 a.m., made repeated phone calls,

and later appeared in civilian clothes near [the p]laintiff's home."  <u>Id.</u> ¶ 66.  The plaintiff further

claims that

> [o]n April 16, 2025, Agent Grentz contacted GSU inquiring about [the p]laintiff's
> employment.  On April 24, [Agent Grentz] called [the plaintiff's employer]
> pretending to be from GSU and asked whether [the p]laintiff was still employed
> and whether he had misbehaved.  GSU later confirmed that no such inquiry had
> been made by their office.

<u>Id.</u> ¶ 67.  Consequently, the plaintiff "believes that federal agents are attempting to detain or

deport him, despite the fact that he has not been convicted of any crime.  <u>Id.</u> ¶ 68.

Upon learning of the termination of his SEVIS record by the defendants, the plaintiff

contends that he contacted his employers to notify them of this development, and both employers

have since terminated his employment.  <u>See id.</u> ¶¶ 69–71.  The plaintiff represents that he has not

been able to secure further employment and consequently "no longer has lawful presence or the

ability to work in the [United States]"  <u>Id.</u> ¶ 72.

---

[9] The plaintiff claims that the defendants "acted without legal authority in terminating [his] SEVIS record and now
seek[] to retroactively justify that action through [its newly adopted April 26, 2025,] policy."  Pl.'s Mem. at 17.

The plaintiff represents that "[a]s a direct result of the SEVIS termination and resulting job losses, [he] has lost approximately $7,100 thus far in income" and "is now struggling to meet basic living expenses[.]" Id. ¶ 73. The plaintiff further represents that he "has invested substantial time and money in his [United States] education and professional development," and that "[t]he termination of his SEVIS record places this investment at risk and threatens his future career prospects." Id. ¶ 74. In addition, the plaintiff claims that he "has experienced severe emotional and psychological distress[,]" due to "the SEVIS termination and repeated visits by federal agents," and he "lives in constant fear of being detained or deported." Id. ¶ 75–76. The plaintiff asserts that "[t]he stigma associated with the SEVIS termination based on criminal grounds has damaged [his] personal and professional reputation." Id. ¶ 78. The plaintiff explains that he "remains uncertain about his immigration status and future in the United States." Id. ¶ 80. Moreover, the plaintiff represents that "[t]he loss of his work authorization and [the defendants' termination of his] SEVIS [record] have cut short [his] participation in the workforce and interrupted his early-career momentum." Id. ¶ 81. Ultimately, the plaintiff contends that "[o]pportunities for advancement, networking, and professional development have now been lost, jeopardizing [his] career aspirations both in the United States and globally[,]" id. ¶ 82, and therefore, "[u]nless his SEVIS record is reinstated or an injunction is granted, [he] faces the ongoing disruption of his career and education, and permanent separation from his life in the United States[,]" id. ¶ 83.

The defendants, in their opposition to the plaintiff's motion, make certain representations that differ from those made by the plaintiff. First, the defendants assert that "[o]n August 29, 2023, [the plaintiff] was indicted by a Fulton County, Georgia[] grand jury of aggravated battery and family violence." Defs.' Opp'n at 3. The defendants represent that "[t]he indictment alleged

that [the plaintiff] struck his spouse in the face with such force as to break her nose," and that "[o]n May 22, 2024, the Superior Court of Fulton County entered [the plaintiff's] plea of guilty to a lesser charge of simple assault," after which the plaintiff "was sentenced to eleven months and twenty-nine days to be served on probation."  Id.  "On March 23, 2025," the defendants represent, "the Bureau of Consular Affairs at the United States Department of State revoked [the plaintiff's] F-1 visa . . . based on the criminal charges showing that [the plaintiff] poses a threat to public safety in the United States."  Id.  Ultimately, the defendants argue that "[t]he revocation of [the plaintiff's] visa with immediate effect makes him subject to removal [from the United States]."  Id. (citing U.S.C. § 1227(a)(1)(B) for its establishment that an individual "whose nonimmigrant visa . . . has been revoked under [S]ection 1201(i) of this title, is deportable").

The defendants allege that they made several attempts to contact the plaintiff, and they cite the plaintiff's acknowledgment of these attempts in his Complaint.  Id. at 4.  The defendants claim that ultimately, "on May 8, 2025, an HSI agent served [the plaintiff] with a notice to appear by mail, thereby initiating removal proceedings."  Id.  They explain that the notice to appear "orders [the plaintiff] to appear before an immigration judge in Atlanta, Georgia[,] on August 4, 2025,[10] to show why he should not be removed from the United States."  Id.

The defendants stipulate to the plaintiff's representation that they terminated the plaintiff's SEVIS record on April 4, 2025, but they also note that "ICE's [April 26, 2025,] policy regarding the termination of SEVIS records states that SEVP may terminate a SEVIS record if the Department of State 'revokes a nonimmigrant visa effective immediately,' because such a revocation 'can serve as a basis for removability.'"  Id. at 4.

---

[10] During the August 1, 2025, status conference, the parties represented that the plaintiff's hearing has now been continued to a date that has not yet been confirmed as of the time of the issuance of this Memorandum Opinion.

During the May 23, 2025, preliminary injunction hearing, the plaintiff represented that he is unable to apply for work authorization, pending commencement of his removal proceedings, without an active SEVIS record, which the defendants contest.

## II.    Procedural Background

On May 4, 2025, the plaintiff filed his Complaint, see generally Compl., and on May 8, 2025, he filed his motion for a temporary restraining order or, alternatively, for a preliminary injunction.  See Pl.s Mot. at 1.  On that same date, the Court issued an Order directing the defendants to enter a notice of appearance and file their opposition to the request for emergency relief in advance of a hearing on the motion that was scheduled for the following day, see Min. Order (May 8, 2025).  The defendants entered their notice of appearance as instructed, see Notice of Appearance at 1, ECF No. 5, and also filed their opposition to the plaintiff's motion, see Defs.' Opp'n at 1.

On May 9, 2025, the parties appeared before the Court for a hearing on the plaintiff's motion.  On May 10, 2025, the Court issued a Temporary Restraining Order granting in part and holding in abeyance in part the plaintiff's motion, ordered supplemental briefing, and scheduled a further hearing on the plaintiff's motion for a preliminary injunction.  See Order at 1 (May 10, 2025), ECF No. 7.

On May 14, 2025, the plaintiff filed his supplemental memorandum in support of his motion for a preliminary injunction.  See Pl.'s Suppl. Br. at 1.  On May 19, 2025, the defendants filed their opposition to the plaintiff's motion.  See Defs.' Suppl. Opp'n at 1.  And, on May 21, 2025, the plaintiff filed his reply in support of his motion for a preliminary injunction.  See Pl.'s Suppl. Reply at 1.  On May 22, 2025, the plaintiff filed a notice of supplemental authority.  See

Pl.'s Notice at 1. And, on May 23, 2025, the parties appeared before the Court for a hearing on

the plaintiff's motion for a preliminary injunction, see Min. Entry (May 23, 2025).

Following the May 23, 2025, preliminary injunction hearing, the Court issued an Order

extending the Temporary Restraining Order that was issued on May 10, 2025, until the Court

would ultimately issue this Memorandum Opinion. See Order (May 23, 2025) at 1, ECF No. 12.

On June 4, 2025, the plaintiff filed a notice of supplemental facts, updating the Court on the

status of the plaintiff's case before the Superior Court of Fulton County, Georgia. See Pl.'s

Suppl. Facts at 1. And, on June 5, 2025, the defendants filed their response to the plaintiff's

notice of supplemental facts. See Defs.' Resp. to Pl.'s Suppl. Facts at 1.[11]

On July 1, 2025, while the Court was in the process of finalizing a Memorandum Opinion

resolving the plaintiff's motion for a preliminary injunction, the parties filed a joint motion to

stay the case, representing that "the parties are currently engaged in discussions in the context of

[the plaintiff's] removal proceedings that may obviate the controversy underlying this litigation."

Joint Motion to Stay at 1. In light of that filing, on July 11, 2025, the Court ceased working on

this Memorandum Opinion and issued a Minute Order granting in part and denying in part the

parties' motion to stay. Specifically, the Court granted the motion to the extent that all pending

deadlines in the case would be vacated until the Court received an update from the parties

regarding their negotiations. See Min. Order (July 11, 2025). The Court further Ordered the

parties to appear for the already scheduled status conference and noted that if this case settled

before that hearing there would be no basis for issuing a Memorandum Opinion resolving the

---

[11] In their response, the defendants contend that "[the p]laintiff does not state how this development bears on the matters under consideration by the Court. Indeed, it is irrelevant. It does not change the relevant facts that [the p]laintiff's visa was revoked with immediate effect, that he is deportable as a result, [and] that he is currently in removal proceedings[.]" Defs.' Resp. to Pl.'s Suppl. Facts at 1.

pending motion for a preliminary injunction.  See id.  However, the Court also noted that if an

agreement had not been reached by the time of the status conference the Court would proceed

with issuing a Memorandum Opinion resolving the pending motion for a preliminary injunction.

See id.  Ultimately, the parties did not reach an agreement by the time of the status conference

and, in light of the parties' filings and oral arguments to date, and their additional representations

during the August 1, 2025, status hearing, the Court proceeded with the preparation of this

Memorandum Opinion.

### III.    STANDARD OF REVIEW

#### A.    Motion for a Preliminary Injunction

Preliminary injunctions are "extraordinary remed[ies] that should be granted only when

the party seeking the relief, by a clear showing, carries the burden of persuasion."  Cobell v.

Norton, 391 F.3d 251, 258 (D.C. Cir. 2004).  A party moving for a preliminary injunction must

show "(1) a substantial likelihood of success on the merits,[12] (2) that [he] would suffer

irreparable injury if the injunction were not granted, (3) that an injunction would not

substantially injure other interested parties, and (4) that the public interest would be furthered by

the injunction."  Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir.

2006).  In "seeking a preliminary injunction, the movant has the burden to show that all four

---

[12] And, "[i]n this context, the 'merits' on which [the] plaintiff must show a likelihood of success encompass not only
substantive theories but also establishment of jurisdiction."  Obama v. Klayman, 800 F.3d 559, 565 (D.C. Cir.
2015).  "Federal district courts are courts of limited jurisdiction[,]" Kokkonen v. Guardian Life Ins. Co. of Am., 511
U.S. 375, 377 (1994), and therefore, the Court is ultimately obligated to dismiss a claim if it "lack[s] . . . subject
matter jurisdiction[.]"  Fed. R. Civ. P. 12(b)(1).  Because "it is to be presumed that a cause lies outside [the Court's]
limited jurisdiction," Kokkonen, 511 U.S. at 377, the plaintiff bears the burden of establishing by a preponderance
of the evidence that a district court has subject matter jurisdiction.  See Lujan v. Defs. of Wildlife, 504 U.S. 555, 561
(1992).  The appropriate disposition where the moving party has not shown . . . jurisdiction is to deny the motion.
See Church v. Biden, 573 F. Supp. 3d 118, 133 (D.D.C. 2021) ("A plaintiff who fails to show a substantial
likelihood of jurisdiction is 'not entitled to any relief, let alone the extraordinary remedy of a preliminary
injunction.'") (quoting Schindler Elevator Corp. v. WMATA, 514 F. Supp. 3d 197, 212 (D.D.C. 2020), aff'd 16
F.4th 294 (D.C. Cir. 2021)).

factors, taken together, weigh in favor of the injunction." Abdullah v. Obama, 753 F.3d 193, 197 (D.C. Cir. 2014) (internal quotation marks omitted). However, "[w]hen the defendant is the government, factors (3) and (4) merge." Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv., 64 F.4th 1354, 1364 (D.C. Cir. 2023).

Although previously "[t]he four factors [were] typically [ ] evaluated on a 'sliding scale[]'" in this Circuit, Davis v. Pension Ben. Guar. Corp., 571 F.3d 1288, 1291 (D.C. Cir. 2009), the Supreme Court's decision in Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7 (2008), cast doubt on the propriety of that approach, see Save Jobs USA v. U.S. Dep't of Homeland Sec., 105 F. Supp. 3d 108, 112 (D.D.C. 2015) (noting that "[i]t is not clear whether th[e sliding scale] approach survives after Winter, which suggested that a likelihood of success on the merits must always be shown"). Indeed, "the [District of Columbia] Circuit has suggested that a positive showing on all four preliminary injunction factors may be required." Holmes v. Fed. Election Comm'n, 71 F. Supp. 3d 178, 183 n.4 (D.D.C. 2014). And at least some Circuit judges have "read Winter at least to suggest[—]if not to hold[—]'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction[.]'" Sherley v. Sebelius, 644 F.3d 388, 393 (D.C. Cir. 2011) (citing Davis, 571 F.3d at 1296 (Kavanaugh, J., concurring)).

Similarly, Winter "makes clear[] [that] a mere 'possibility' of irreparable harm will not suffice." Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos, 344 F. Supp. 3d 158, 167 (D.D.C. 2018) (quoting Winter, 555 U.S. at 22). Indeed, "a showing that irreparable injury is 'likely' is the sine qua non for obtaining a preliminary injunction—it is what justifies the extraordinary remedy of granting relief before the parties have had the opportunity fully to develop the evidence and fully to present their respective cases." Achagzai v. Broad. Bd. of Governors, No. 14-cv-768 (RDM), 2016 WL 471274, at *3–4 (D.D.C. Feb. 8, 2016). Therefore, "[a] movant's

failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction,

even if the other three factors entering the calculus merit such relief." England, 454 F.3d at 297;

see also S. Educ. Found. v. U.S. Dep't of Educ., No. 25-cv-1079 (PLF), 2025 WL 1453047, at

*12 (D.D.C. May 21, 2025) (quoting Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,

205 F. Supp. 3d 4, 26 (D.D.C. 2016)) ("[A] failure to show a likelihood of success on the merits

alone is sufficient to defeat a preliminary-injunction motion.").

    In order to establish a likelihood of success on the merits, a party moving for a

preliminary injunction must also establish subject-matter jurisdiction.  See, e.g., Uranga v. U.S.

Citizenship & Immigr. Servs., 527 F. Supp. 3d 10, 18 (D.D.C. 2020); Climate United Fund v.

Citibank, N.A., No. 25-cv-698 (TSC), 2025 WL 1131412, at *8 (D.D.C. Apr. 16, 2025); Church,

573 F. Supp. 3d at 133; see also Ponte v. Fed. Deposit Ins. Corp., No. 24-cv-2379 (APM), 2024

WL 4730602, at *2 (D.D.C. Oct. 11, 2024) ("[T]he merits on which [a] plaintiff must show a

likelihood of success encompass not only substantive theories but also establishment of

jurisdiction.") (alterations in original) (quoting Food & Water Watch, Inc. v. Vilsack, 808 F.3d

905, 913 (D.C. Cir. 2015)).  And, failure to establish likelihood of success on the merits is a bar

to relief for a party seeking a preliminary injunction.  See England, 454 F.3d at 297; S. Educ.

Found., 2025 WL 1453047, at *12 (quoting Standing Rock Sioux Tribe, 205 F. Supp. 3d at 26)

("'a failure to show a likelihood of success on the merits alone is sufficient to defeat a

preliminary-injunction motion.'").

## IV.    ANALYSIS

    The plaintiff argues that the Court should "preserve the status quo that existed prior to the [ ]

termination [of his SEVIS record by the defendants] and prevent further irreparable harm while

this case is adjudicated."  Pl.'s Mot. at 2.  Specifically, the plaintiff requests that the Court (1)

require the defendants to "immediately and fully reinstate [his] SEVIS record, retroactive to the date of termination"; (2) declare that the defendants' "prior termination of [his] SEVIS record shall have no legal effect and shall not interfere with his ability to pursue work authorization, maintain lawful presence, or apply for any other immigration benefit associated with F-1 status"; (3) "enjoin[ the defendants] from terminating [his] SEVIS record during the pendency of this litigation"; (4) prohibit the defendants "from detaining [him], initiating removal proceedings, or taking any adverse immigration enforcement action against him based on the prior SEVIS termination"; and (5) "waive any bond requirement under Federal Rule of Civil Procedure 65(c) . . . ." Id. at 2–3.

In his supplemental brief in support of his motion for a preliminary injunction, the plaintiff makes three main arguments: (1) that "the SEVIS termination is a standalone, collateral agency action not subsumed within the removal process[,]" and which is therefore within the Court's jurisdiction, Pl.'s Suppl. Br. at 1; (2) that the distinction the defendants attempt to make between visa revocations that are "prudential" and those that have "immediate effect" is "vague and unworkable . . . lack[ing] any basis in law or regulation[,]" id.; and (3) that "despite the temporary reinstatement of his SEVIS record, [the plaintiff] continues to face the threat of irreparable harm as a direct result of the unlawful termination, including loss of work authorization, stigma, financial instability, and ongoing psychological and emotional trauma[,]" id.

In opposition, the defendants argue that (1) "[t]he Court lacks subject matter jurisdiction over [the plaintiff's] claims challenging actions taken antecedent to and in contemplation of those removal proceedings, which includes the termination of his [SEVIS] record[,]" Defs.' Suppl. Opp'n at 6; (2) "[t]he Privacy Act further bars [the plaintiff] from seeking a change to his SEVIS

record[,]" id.; and (3) "even if the termination of [the plaintiff's] SEVIS record were reviewable, the Court should conclude that ICE has a rational basis to take that action here[,]" id.  They also argue, citing 8 C.F.R. §274a.14(a)(1)(ii), that the plaintiff's "authorization to engage in his OPT automatically terminated with the initiation of his removal proceedings[.]"  Id. at 16.

In reply, the plaintiff argues that the defendants wholly misinterpret 8 U.S.C. § 1252 in their briefing.  See Pl.'s Suppl. Reply at 1.  Specifically, the plaintiff represents that when his "visa was revoked on March 23, 2025, DHS policy then in effect made clear that a visa revocation does not justify SEVIS termination.  Yet[, the d]efendants proceeded to terminate [the p]laintiff's SEVIS record . . . based on visa revocations and other grounds not permitted by regulation."  Id. Then, the plaintiff contends, after losing several challenges to their termination of several SEVIS records in court, the defendants "hastily issued a new policy that created an unexplained distinction between visa revocations with 'immediate effect' and 'prudential revocations,'" id., the plaintiff's revocation constituting the former, and, the plaintiff alleges, the defendants "now want to retroactively apply this brand-new policy to [the p]laintiff more than a month after his visa was revoked, even though, at the time of that revocation, DHS policy expressly stated that visa revocation had no effect on a student's SEVIS record[,]" id.  The plaintiff therefore represents that "[o]n the merits, [the d]efendants' conduct is a textbook example of arbitrary and capricious agency action and is precisely the kind of post hoc justification the APA prohibits." Id. at 2.

During the August 1, 2025, status hearing, the government took a slightly different position, citing 8 C.F.R. §274a.14 to make the blanket argument that while the plaintiff can apply for work reauthorization, the initiation of removal proceedings against him precludes him from working, regardless of the status of his SEVIS record.

For the reasons outlined below, the Court concludes that the plaintiff successfully established a likelihood that the Court has jurisdiction over his requests to have his SEVIS record reinstated, retroactive to the date of termination and that the prior termination of the plaintiff's SEVIS record "shall not interfere with his ability to pursue work authorization, maintain lawful presence in the United States, or apply for any other immigration benefit associated with F-1 status[.]" Pl.'s Mot. at 2. On the other hand, the Court concludes that it lacks jurisdiction over the plaintiff's requested relief to the extent that he seeks to have the Court enjoin the defendants from again terminating his SEVIS record during the pendency of this litigation and to prohibit the defendants from detaining him, "initiating removal proceedings, or taking any adverse immigration enforcement action against him based on the prior SEVIS termination[,]" id. at 3. The Court further concludes that the plaintiff has established a substantial likelihood of success on the merits, that he would likely suffer irreparable injury if the preliminary injunction were not granted, and that a preliminary injunction both would not substantially injure other interested parties and would further the public interest.

The Court notes that, unlike the other cases that have been brought as a result of similar agency action, the defendants here claim that the plaintiff's visa had already been revoked by the State Department, and the agency had already initiated removal proceedings on those grounds— which remain grounds for removal under the new April 26, 2025, SEVIS termination policy. In the analysis that follows, the Court will first address whether the plaintiff is likely to succeed on the merits. Because it ultimately concludes that he will, the Court will then address whether the plaintiff has established irreparable injury. Because the Court ultimately concludes that he has, the Court will finally turn to whether the balance of equities and public interest are best served by the Court granting in part the preliminary injunction.

A.        Whether the Plaintiff is Likely to Succeed on the Merits

The Court first assesses the plaintiff's likelihood of success on the merits and, in particular, whether it has jurisdiction to grant the plaintiff's motion for a preliminary injunction. As noted earlier, in order to establish a likelihood of success on the merits, a party moving for a preliminary injunction must establish the Court's subject-matter jurisdiction.  See, e.g., Uranga, 527 F. Supp. 3d at 18; Climate United Fund, 2025 WL 1131412, at *8; Church, 573 F. Supp. 3d at 133.  And, failure to establish likelihood of success on the merits is a bar to relief for a party seeking a preliminary injunction.  See, e.g., Winter, 555 U.S. at 20; ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.) (emphasis added); Davis, 571 F.3d at 1291–92 ("If the movant makes an unusually strong showing on one of the [preliminary injunction] factors, then it does not necessarily have to make as strong a showing on another factor."); England, 454 F.3d at 304 ("[A] preliminary injunction will not issue unless the moving party also shows, on the same facts, a substantial likelihood of success on the merits[.]"); S. Educ. Found., 2025 WL 1453047, at *12 (quoting Standing Rock Sioux Tribe, 205 F. Supp. 3d at 26) ("[A] failure to show a likelihood of success on the merits alone is sufficient to defeat a preliminary-injunction motion.").[13]  Here, for the reasons outlined below, the Court concludes

---

[13] There appears to be some ambiguity as to whether the Court must, on the one hand, conclude that a party has established a mere likelihood of jurisdiction in order to conclude that party has also established a substantial likelihood of success on the merits, or on the other hand, whether the Court must conclude that a party definitively has jurisdiction in order to make such a finding.  See, e.g., Klayman v. D.C. Ct. of Appeals, No. 24-cv-2997 (RBW), 2025 WL 1517247, at *1 (D.D.C. May 28, 2025) ("the Court concludes that it must deny the plaintiff's motion for a preliminary injunction because the plaintiff has failed to establish a likelihood that the Court has subject matter jurisdiction over the claims he raises in his motion"); Church, 573 F. Supp. 3d at 113 ("A plaintiff who fails to show a substantial likelihood of jurisdiction is not entitled to any relief, let alone the extraordinary remedy of a preliminary injunction.") (internal quotation marks omitted).  However, the Court need not address that ambiguity here, as it nonetheless definitively concludes that it has subject matter jurisdiction over the plaintiff's claims as they relate to the April 4, 2025, termination by the defendants of his SEVIS record.

that the plaintiff has established that the Court has jurisdiction over the claims he raises in his motion for a preliminary injunction as they relate to the April 4, 2025, termination of his SEVIS record by the defendants, although the Court concludes that it lacks jurisdiction over his claims in all other respects. The Court further concludes that the plaintiff will likely succeed on the merits of his claims over which it concludes it has jurisdiction.

In this section, the Court will first address whether this case raises issues that are independent from the removal proceedings which the defendants have initiated against the plaintiff; it will then address the question of whether the government has waived its sovereign immunity as to the plaintiff's APA claims; and finally, the Court will address whether the defendants' termination of the plaintiff's SEVIS record was final agency action over which this Court has jurisdiction.

### 1. Whether Termination of the Plaintiff's SEVIS Record is Independent from Removal Proceedings

The plaintiff represents that "[t]his Court has jurisdiction because [his] challenge to the termination of his SEVIS record is collateral to removal proceedings and is not barred by 8 U.S.C. § 1252(g) or § 1252(b)." Pl.'s Suppl. Br. at 5. Specifically, the plaintiff contends that the termination of his SEVIS record by the defendants "is a separate, collateral agency action that occurred before removal proceedings began and has independent legal effect." Id. at 7.

In their supplemental opposition, the defendants represent that 8 U.S.C. § 1252(b)(9) bars review by this court of the defendants' termination of the plaintiff's SEVIS record because that record termination "arises from removal actions." Defs.' Suppl. Opp'n. at 7. Specifically, the defendants contend that, "because [the defendants'] termination of [the plaintiff's] SEVIS record was an action taken in contemplation of the fact that he was removable—and removal proceedings have in fact commenced—the termination of [his] SEVIS record in these

circumstances is outside of the Court's jurisdiction under 8 U.S.C. § 1252." Id.  They elaborate

that "[t]he INA states that a petition for review following removal proceedings 'shall be the sole

and exclusive means for judicial review of an order of removal.'"  Id. (quoting 8 U.S.C. §

1252(a)(5)).  And, they assert, "a 'zipper' clause' consolidates judicial review of all claims

connected to removal proceedings and actions into the petition-for-review mechanism."  Id.

(quoting Reno v. Am.-Arab Anti-Discrimination Comm. ("AADC"), 525 U.S. 471, 483 (1999)).

They also contend that 8 U.S.C. § 1252(b)(9) "is a judicial channeling provision, not a claim-

barring one."  Id. at 8 (quoting Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of

Homeland Sec., 510 F.3d 1, 11 (1st Cir. 2007)).  Essentially, the defendants argue that "[t]he

termination of [the plaintiff's] SEVIS record presents questions 'arising from [an] action taken . .

. to remove' him and therefore falls within the zipper clause that channels review away from this

Court to a petition for review" in a federal court of appeals, id. (quoting 8 U.S.C. § 1252(b)(9))

(second alteration in original), and, "in this case, it is clear from the circumstances surrounding

[the defendants'] termination of [the plaintiff's] SEVIS record that this termination arises from

[the plaintiff's] removability and contemplated removal[,]" id. at 9.

     The defendants also attempt to distinguish their position from the Court's position as

articulated in its Temporary Restraining Order, namely that "the defendants' removal of the

plaintiff from the [SEVIS] system cannot reasonably be considered as part of the proceeding

regarding his removal from the United States[, so] although the defendants have initiated

removal proceedings against the plaintiff, the plaintiff still has the right to challenge his removal

before an Administrative Judge."  Order (May 10, 2025) at 1, ECF No. 7 (emphasis added).

Instead, the defendants assert that "the zipper clause does not channel only questions arising

from a removal 'proceeding'; it also covers 'any action taken . . . to remove an alien[]' . . . . This

expansive language sweeps up 'any removal-related activity,' . . . including actions taken before removal proceedings commence[.]"  Defs.' Suppl. Opp'n at 10 (first quoting 8 U.S.C. § 1252(b)(9) (emphasis added by defendants), second quoting J.E.F.M. v. Lynch, 837 F.3d 1026, 1031 (9th Cir. 2016) (emphasis in original), and third citing Aguilar, 510 F.3d at 10).[14]

The plaintiff counters that "the SEVIS termination did not arise from, and was not part of, any removal proceeding."  Pl.'s Suppl. Reply at 2.  Indeed, the plaintiff notes that "at the time of [his] SEVIS termination on April 4, 2025, there was no pending removal action, and the very policy [the d]efendants now cite to link SEVIS termination to removability was not issued until April 26, 2025."  Id.  Therefore, the plaintiff represents that "[b]ecause the termination was neither authorized by law nor tethered to a removal action, it constitutes a standalone agency action subject to APA review, not a decision 'arising from' removal within the meaning of § 1252(b)(9)."  Id.  The plaintiff also notes that the termination by the defendants of his SEVIS record is "unreviewable in immigration court[,]" id. at 4, because "[t]he only mechanism available to a student following SEVIS termination is to seek reinstatement through [the United States Citizenship and Immigration Service ('USCIS'),]" id. (for the proposition that SEVIS termination is not reviewable during removal proceedings, first citing Madan B K v. Noem, No. 25-cv-419 (JMB), 2025 WL 1171572, at *6 (W.D. Mich. Apr. 23, 2025), then citing Doe v. Noem ("Student Doe"), No. 25-cv-633 (DGE), 2025 WL 1141279, at *3 (W.D. Wash. Apr. 17, 2025)).  In other words, the plaintiff emphasizes that he

> is not asking for review of an order of removal and is not challenging any part of the process by which his removability will be determined.  The relief sought is . . . separate from any removal proceedings.  Because the substance of the relief

---

[14] The parties also dispute the meaning and importance of prudential and immediate visa revocation.  See, e.g., Pl.'s Suppl. Br. at 8; Defs.' Suppl. Opp'n at 11.  Because that issue is not essential to the Court's analysis at this stage, the Court does not address it here.  However, the Court may revisit that issue at a later stage of this litigation.

demonstrates that [the p]laintiff's claims are independent of challenges to removal orders, this Court retains jurisdiction to hear them.

Id. at 8.

Section § 1252(b)(9), which provides that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section." While the defendants contend that this Section contains a "'zipper' clause" that "consolidates judicial review of all claims connected to removal proceedings and actions into the petition-for-review mechanism[,]" Defs.' Suppl. Opp'n at 7 (quoting AADC, 525 U.S. at 483), the Ninth Circuit further interpreted that concept in J.E.F.M.[15]:

> Although [§] 1252(b)(9) might seem draconian at first glance, [it has] two mechanisms that ensure immigrants receive their "day in court." Singh v. Gonzales, 499 F.3d 969, 979 (9th Cir. 2007). First, while [this section[] limit[s] how immigrants can challenge their removal proceedings, [it is] not [a] jurisdiction-stripping statute[] that, by [its] terms, foreclose[s] all judicial review of agency actions. Instead, the provision[] channel[s] judicial review over final orders of removal to the courts of appeals . . . . The Supreme Court has thus characterized § 1252(b)(9) as a " 'zipper' clause," AADC[, 525 U.S. at 483], explaining that the statute's purpose "is to consolidate 'judicial review' of immigration proceedings into one action in the court of appeals[.]" INS v. St. Cyr, 533 U.S. 289, 313 & n.37 (2001).
>
> Second, and equally importantly, § 1252(b)(9) has built-in limits. By channeling only those questions "arising from any action taken or proceeding brought to remove an alien," the statute excludes from the [petition for review ("PFR") in a federal court of appeals] process any claim that does not arise from removal proceedings. Accordingly, claims that are independent of or collateral to the

---

[15] The Court notes that, given the unique facts of this case, the Court had to primarily rely upon out-of-Circuit case law in conducting its analysis. While some cases within this Circuit address SEVIS record terminations (see, e.g., Badam v. Lyons, No. 25-cv-1098 (CJN), 2025 WL 1302026 (D.D.C. May 5, 2025); Hinge v. Lyons, No. 25-cv-1097 (RBW), 2025 WL 1134966 (D.D.C. Apr. 15, 2025)) and others address the Court's jurisdiction over claims that may or may not be related to a plaintiff's removal proceedings (see, e.g., S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec., 605 F. Supp. 3d 157, 164–65 (D.D.C. 2022); Uranga, 527 F. Supp. 3d at 18), the most relevant case law applicable to this particular case is comprised of persuasive authority from other Circuits.

removal process do not fall within the scope of § 1252(b)(9).  See Torres–Tristan v. Holder, 656 F.3d 653, 658 (7th Cir. 2011) . . . ; Aguilar, 510 F.3d at 11 . . . .

Thus, we have distinguished between claims that "arise from" removal proceedings under § 1252(b)(9)—which must be channeled through the PFR process—and claims that are collateral to, or independent of, the removal process.

837 F.3d at 1031–32 (emphasis in original).

In Jennings v. Rodriguez, 583 U.S. 281 (2018), the Supreme Court addressed the "potential obstacle[]" to jurisdiction posed by Section 1252(b)(9); however, the Court was comprised of merely eight justices at the time, whose views were fragmented.  See 583 U.S. at 290–296 (Alito, J., joined by Roberts, C.J. and Kennedy, J.) (jurisdiction); id. at 315–25 (Thomas, J., concurring, joined by Gorsuch, J.) (no jurisdiction); id. at 355 (Breyer, J., dissenting, joined by Ginsburg, J. and Sotomayor, J.) (jurisdiction).  There, the Supreme Court concluded that the legal question at issue did not arise from acts governed by Section 1252(b)(9).  Specifically, "Justice Alito first rejected an 'expansive' interpretation of [the term] 'arising from' that would bar jurisdiction simply because [the plaintiffs] would not [have been] in custody at all if actions to remove them had never been taken."  Cancino-Castellar v. Nielsen, 338 F. Supp. 3d 1107, 1113 (S.D. Cal. 2018), aff'd sub nom. Castellar v. Mayorkas, No. 17-cv-491 (BAS), 2021 WL 3856488 (S.D. Cal. Aug. 30, 2021) (citing Jennings, 583 U.S. at 292–93).  Justice Alito further rejected this interpretation of "arising from" due to its likely effect of rendering "claims of prolonged detention effectively unreviewable."  Jennings, 583 U.S. at 293.  Finally, "Justice Alito cautioned that 'when confronted with capacious phrases like arising from, we have eschewed uncritical literalism leading to results that no sensible person could have intended.'"  Cancino-Castellar, 338 F. Supp. 3d at 1113 (quoting Jennings, 583 U.S. at 293–94).  Justice Alito ultimately concluded that "it is enough to note that [the] respondents are not asking for review of an order of removal; they are not challenging the decision to detain them in the first place or to seek removal; and they are not even challenging any part of the process by which

their removability will be determined." <u>Jennings</u>, 583 U.S. at 294. In so concluding, he reasoned that "[t]he question is not whether <u>detention</u> is an action taken to remove an alien but whether <u>the legal questions</u> in this case arise from such an action . . . . [T]hose legal questions are too remote from the actions taken to fall within the scope of § 1252(b)(9)." <u>Id.</u> at 295 n.3 (emphasis in original). <u>See also</u> <u>Delgado v. Quarantillo</u>, 643 F.3d 52, 55 (2d Cir. 2011) ("[W]hether the district court has jurisdiction will turn on the substance of the relief that a plaintiff is seeking.").

Section 1252(g) provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings . . . against any alien under this chapter." In <u>AADC</u>, the Supreme Court concluded that only a narrow reading of § 1252(g) is appropriate. <u>Id.</u> at 487. Specifically, the <u>AADC</u> court concluded that the "assumption that § 1252(g) covers the universe of deportation claims—that it is a sort of 'zipper' clause that says 'no judicial review in deportation cases unless this section provides judicial review[]'" has not been tested, and that "[i]n fact, what § 1252(g) says is much narrower." <u>Id.</u> at 482. Indeed, "[t]he provision applies only to three discrete actions that the Attorney General may take: her 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.'" <u>Id.</u> (internal emphasis omitted). And, "[t]here are of course many other decisions or actions that may be part of the deportation process—such as the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order." <u>Id.</u> Therefore, the Court reasoned that "[i]t is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings." <u>Id.</u>; <u>see also</u>

Fornalik v. Perryman, 223 F.3d 523, 531 (7th Cir. 2000) ("[A]lmost every alien who brings a claim to federal court . . . does so because she [or he] is threatened with removal from the United States . . . . As the [Immigration and Naturalization Service] would have it here, the alien not only would be barred from raising virtually all claims prior to removal proceedings (because of exhaustion requirements), but then § 1252(g) would preclude jurisdiction of all claims brought after removal is threatened.  Such a sweeping reading would be inconsistent with the narrow interpretation of § 1252(g) that AADC commands." (emphases removed)).

Other district courts have reached this same conclusion in similar cases to the one presently before the Court.  In Student Doe, the plaintiff student sued the defendants "for terminating [the] plaintiff's [SEVIS] record, which had the effect of terminating plaintiff's F-1 visa status."  Doe v. Noem, No. 25-cv-01103-DAD-AC, 2025 WL 1134977, at *1.  The plaintiff sought essentially the same injunctive relief that the plaintiff seeks here, and the defendants argued that § 1252(g) barred that relief.  See id. at *3, 8.  A member of the United States District Court for the Eastern District of California noted that, under Ninth Circuit precedent, § 1252(g) does not divest courts of jurisdiction over cases unrelated to prosecutorial discretion and that address "a purely legal question[.]"  Id. at *7 (quoting Sied v. Nielsen, No. 17-cv-6785, 2018 WL 1142202, at *21 (N.D. Cal. Mar. 2, 2018) (quoting United States v. Hovsepian, 359 F.3d 1144, 1155 (9th Cir. 2004) (en banc))).  That court therefore held that § 1252(g) "addresses challenges predicated on purported improper use of discretionary authority to commence removal proceedings, which is not at issue[,]" Id. at *7.  In Ozturk v. Trump, ___ F. Supp. 3d ___, ___, No. 25-cv-374 (WKS), 2025 WL 1145250, at *12 (D. Vt. Apr. 18, 2025), a member of the United States District Court for the District of Vermont noted that the Second Circuit has held that "a suit brought against immigration authorities is not per se a challenge to a removal

order; whether the district court has jurisdiction will turn on the substance of the relief that a plaintiff is seeking." Id. at *12 (quoting Delgado v. Quarantillo, 643 F.3d 52, 55 (2d Cir. 2011) (internal quotation marks omitted)). And, the Ozturk court held that the plaintiff's claims challenging "the termination of her SEVIS" did not "raise challenges to the removal process," so § 1252 did not apply. Id.; see also Chen v. Noem, No. 25-cv-733 (TWP), 2025 WL 1163653, at *9 (S.D. Ind. Apr. 21, 2025). [16]

Here, the challenge of the defendants' termination of the plaintiff's SEVIS record is not "clearly cognizable in the PFR process[,]" Cancino-Castellar, 338 F. Supp. 3d at 1116, and there seemingly being no ability to have SEVIS terminations reversed during removal proceedings, the Court concludes that its jurisdiction over the plaintiff's SEVIS termination claim is not barred by Section 1252(b)(9). While it is not clear how a SEVIS record termination could be "an action taken to remove an alien[,]" Jennings, 583 U.S. 295 n.3, given that SEVIS termination does not appear to automatically initiate removal proceedings, the plaintiff's claims concerning his SEVIS termination also raise legal questions that arise from an action taken prior to his receipt of a notice to appear for removal proceedings and the defendants' issuance of the April 26, 2025, SEVIS termination policy that they now seek to apply retroactively. Collectively, these considerations logically lead to the conclusion that the legal questions presented here do not "arise from [a removal] action." Id.

Accordingly, the Court concludes that it has jurisdiction over the plaintiff's claims as they relate specifically to the April 4, 2025, termination of the plaintiff's SEVIS record by the defendants. The plaintiff "is not challenging the commencement, adjudication, or execution of

---

[16] While the Court has already noted that the plaintiff in this case presents facts that are unique from those presented by plaintiffs in other SEVIS-termination cases, those differences are not material for the purposes of this part of the Court's analysis.

[a] removal order; he is not even challenging the merits of a decision on his eligibility for an [F-1 visa] or work authorization." Uranga v. U.S. Citizenship & Immigr. Servs., 490 F. Supp. 3d 86, 97 (D.D.C. 2020). He is challenging the defendants' termination of his SEVIS record prior to his receipt of a notice to appear for removal proceedings and prior to the issuance of a decision regarding his removal. Therefore, Section 1252(g) does not apply to the plaintiff's claims and also does not deprive this Court of jurisdiction over his requests to have his SEVIS record reinstated and to preclude the defendants' original termination of his SEVIS record from having any future impact on his ability to pursue work authorization, lawful status in the United States, or ability to apply for further benefits associated with his F-1 status. However, as the Court has already noted, the Court is jurisdictionally barred from prohibiting the defendants from terminating the plaintiff's SEVIS record for other reasons or detaining him in connection with his removal proceeding.

To reiterate, the plaintiff has requested various forms of relief, including, inter alia, enjoining the defendants "from terminating [the p]laintiff's SEVIS record during the pendency of this litigation[,]" Pl.'s Mot. at 3, and "prohibit[ing]" the defendants "from detaining [the p]laintiff, initiating removal proceedings, or taking any adverse immigration enforcement action against him based on the prior SEVIS termination[,]" id. While the Court will require the defendants to reinstate the plaintiff's SEVIS record to active status, retroactive to the date of its original termination, and prohibit the defendants from taking any adverse immigration enforcement action against the plaintiff based on the prior SEVIS termination, the Court, due to the jurisdictional barriers explained above, cannot issue a blanket preliminary injunction on any future SEVIS record termination that may be taken by the defendants during the pendency of this

litigation and also cannot prohibit the defendants from detaining the plaintiff if there is a legal basis to do so.

## 2.    Sovereign Immunity

The defendants contend that this Court lacks jurisdiction over the plaintiff's APA challenge because the government has not waived its sovereign immunity as the Privacy Act bars the plaintiff, as a noncitizen, from seeking any relief. See Defs.' Suppl. Opp'n at 12. The APA waives sovereign immunity for actions brought in a federal district court by "person[s] suffering legal wrong because of agency action[.]" 5 U.S.C. § 702. However, that waiver is constrained in three ways: (1) the plaintiff must "seek[] relief other than money damages"; (2) the plaintiff cannot have any "other adequate remedy"; and (3) the plaintiff's action cannot be "expressly or impliedly forbid[den]" by another statute. Id. §§ 702, 704.

Here, the defendants argue that "[a]lthough the APA provides a limited waiver of the government's sovereign immunity for suits challenging final agency action and 'seeking relief other than money damages,' it does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" Defs.' Suppl. Opp'n at 12 (quoting 5 U.S.C. § 702). And, the defendants contend, "[t]hat carve-out prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." Id. (internal quotation marks and citation omitted). They further represent that "[t]he Privacy Act of 1974 . . . limits [the plaintiff's] ability to seek the relief he requests[,]" id., because his "claims seek relief provided by the Privacy Act: the amendment of his SEVIS record[,]" id. at 14, and that same statute provides that it only governs claims brought by "a citizen of the United States or an alien lawfully admitted for permanent residence[,]" id. (quoting 5 U.S.C. § 552a(a)(2)). In other words, the defendants contend that the plaintiff "makes no claim, nor can he, that he is either a

U.S. citizen or a lawful permanent resident[, and a]s such, the Privacy Act precludes judicial review of [his] claims." Id. at 15.

In his reply, the plaintiff represents that "[t]he Privacy Act does not apply and, even if it did, it would not bar [the p]laintiff's APA claim." Pl.'s Suppl. Reply at 9. Specifically, he posits that the defendants "invoke the Privacy Act as a silver bullet to bar [the p]laintiff's challenge under the APA" and "contend that[,] because the Privacy Act is the exclusive vehicle for challenging the contents of government records, and because [the p]laintiff, an F-1 student, is neither a U.S. citizen nor a lawful permanent resident, he may not sue under it[,]" and therefore[,] the plaintiff's "APA claim must also be precluded." Id. Moreover, the plaintiff argues that "[p]reclusion does not apply here because . . . [he] cannot bring a claim under the Privacy Act due to his status as a nonimmigrant student" and therefore that statute clearly cannot serve as an alternative, adequate remedy. Id. (citing Doe, 2025 WL 1134977, at *5 for its conclusion that "the Privacy Act clearly does not provide [the] plaintiff another adequate remedy, as [the] plaintiff's ability to seek relief under the Privacy Act is not even 'doubtful,' but nonexistent")). The plaintiff further represents that the defendants "mischaracterize the nature of [his] claim in suggesting it falls within the scope of the Privacy Act." Id. Specifically, the plaintiff notes that he "is not alleging that the SEVIS record contains incorrect personal data, nor is he seeking to amend a factual inaccuracy as contemplated by the Privacy Act. Rather, [his] APA claim asserts that the SEVIS database accurately reflects an unlawful agency action: the improper termination of his SEVIS record[.]" Id. at 9–10 (citing Douglas v. Agric. Stabilization & Conservation Serv., 33 F.3d 784, 785 (7th Cir. 1994) for the proposition that "[T]he Privacy Act does not permit a court to alter documents that accurately reflect an administrative action . . . . The right response to error is to correct the disposition under the [APA].").

To reiterate, the defendants rely on the Privacy Act provision that limits availability of the statute's remedies to "citizen[s]" and those who are "lawfully admitted for permanent residence[.]" 5 U.S.C. § 552a(a)(2). However, "Congress did not intend for the Privacy Act to be an 'exclusive' source of claims or remedies for alleged mishandling of records about individuals that impliedly forbids other relief under the APA." All. for Retired Ams. v. Bessent, 770 F. Supp. 3d 79, 105 (D.D.C. 2025). Here, the plaintiff is not challenging unauthorized disclosure of confidential information, and his APA claim could not be remedied by use of the Privacy Act. See, e.g., Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just., 846 F.3d 1235, 1245 (D.C. Cir. 2017) (noting that any alternative form of relief must provide the "same genre" of relief in order to have preclusive effect). Therefore, the Court agrees with the plaintiff that the Privacy Act does not provide the plaintiff with an alternate remedy, as his ability to seek relief under the Privacy Act is "nonexistent." Student Doe, 2025 WL 1134977, at *5. Because the plaintiff would not qualify for relief under the Privacy Act, the Court concludes that he lacks an alternative, adequate remedy that constrains waiver of the government's immunity under the APA.

### 3.    Final Agency Action

Pursuant to the APA, judicial review of agency action is only appropriate in the case of "final agency action."[17] 5 U.S.C. § 704. In other words, "[f]inality is a prerequisite to the judicial review of an APA claim." Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, 775 F. Supp. 3d 100, 123 (D.D.C. 2025). Final agency action is defined as action that "mark[s] the consummation of the agency's decisionmaking process" and determines "rights or

---

[17] The APA prohibits courts from reviewing the "day-to-day operations" of agencies. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 899 (1990).

obligations . . . from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177–78 (1997) (first quoting Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 113 (1948); and then quoting Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71 (1970)).

Here, the plaintiff has also shown a likelihood of success on at least[18] his claim under the APA that the defendants' termination of his SEVIS record was arbitrary and capricious and failed to accord him due process. See Compl. ¶¶ 84–87. As an initial matter, the Court finds that the defendants' termination of the plaintiff's SEVIS record is likely a final agency action because it has significant legal consequences for the plaintiff. Specifically, if the plaintiff's SEVIS record is not returned to "active" status by the Court's grant of a preliminary injunction, the plaintiff cannot obtain renewed work authorization and cannot immediately recommence his training in the United States should the Judge overseeing his removal proceedings ultimately conclude that he should be permitted to remain in this country. See Sultan, 2025 WL 1207071, at *5 (concluding that "terminating Sultan's SEVIS record is likely a final agency action, as it has a potentially severe legal consequence for [the p]laintiff, who can no longer work and who may have to leave the United States"). Indeed, "[e]ven though [the d]efendants [have not] confirm[ed] whether [the plaintiff's] F-1 legal status is terminated, it is reasonable to assume that it is, because his visa has been revoked and his SEVIS record terminated[.]" Id. And, "in [that] case[, the d]efendants [would] have [likely] violated 8 C.F.R. § 214.1(d) by not following [their] own regulation before" terminating the plaintiff's SEVIS status. Id. "[B]ecause the APA

---

[18] Because "[t]he Court need only find that [the plaintiff is] likely to succeed on one of [his] claims for this factor to weigh in favor of a preliminary injunction[,]" Aids Vaccine Advoc. Coal. v. U.S. Dep't of State, 770 F. Supp. 3d 121, 134 (D.D.C. 2025), the Court will only address the plaintiff's claim concerning arbitrary and capricious agency action. See also S. Educ. Found., 2025 WL 1453047, at *15 n.8 (citing Media Matters for Am. V. Paxton, 732 F. Supp. 3d 1, 27 (D.D.C. 2024)). Therefore, the Court will not assess the plaintiff's ultra vires and Fifth Amendment claims for the purposes of this analysis.

provides for due process, [the d]efendants' failure to provide [the plaintiff] with an opportunity to be heard regarding his SEVIS record termination also indicates a likelihood of success on the merits." Id. (citing 5 U.S.C. § 706(2)(D)).

Moreover, no statutory or regulatory requirement that a student seek reinstatement of student status in SEVIS appears to exist. Thus, "[e]ven if a student attempts to pursue the administrative procedure for SEVIS reinstatement, there is no 'mechanism to review the propriety' of the original termination." Mandan, 2025 WL 1171572, at *6 (citing Doe, 2025 WL 1141279, at *3). And, "[b]ecause neither immigration judges nor the Board of Immigration Appeals (BIA) have the authority to review SEVIS termination or a USCIS denial of reinstatement, there is no proceeding in which a student can contest the agency action at issue here." Id. Therefore, as other courts throughout the nation have done, the Court preliminarily concludes that the defendants' termination of the plaintiff's SEVIS record was "a unilateral determination with immediate legal consequences over which [the plaintiff has] no ability to seek administrative review." Id. (citing Hinge v. Lyons, No. 25-cv-1097 (RBW), 2025 WL 1134966, at *1 (D.D.C. Apr. 15, 2025) ("[T]he record at this stage seems to indicate that final agency action has occurred[.]"); Patel v. Bondi, No. 25-cv-101 (WSH), 2025 WL 1134875, at *2 (W.D. Pa. Apr. 17, 2025) ("The SEVIS termination is a final agency decision susceptible to judicial review."); Doe, 2025 WL 1141279, at *3 (reaching the same conclusion)). Accordingly, the Court concludes that the defendants' termination of the plaintiff's SEVIS record was likely a final agency action that resulted in the filing of the plaintiff's APA claims, over which the Court has jurisdiction.

### 4.    Was the Defendants' Action Arbitrary and Capricious

Pursuant to the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that it concludes are "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow[,] and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). In order to avoid action that is arbitrary and capricious, an agency "must examine the relevant data and articulate a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" Id. (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). Unlawful agency action generally "relie[s] on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id.

The arbitrary-and-capricious review at this stage of litigation focuses on the rationality of the action taken by the agency. See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, 763 F. Supp. 3d 36, 54 (D.D.C. 2025); see also Fed. Commc'ns Comm'n v. Prometheus Radio Project, 592 U.S. 414, 423 (2021) ("A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision."); see also Smith v. Garland, 103 F.4th 1244, 1252 (7th Cir. 2024) ("the arbitrary and capricious standard requires an agency to do its homework; decisions that overlook relevant record evidence or lack a satisfactory answer do not pass muster"). And, the Court concludes that the defendants have not met that standard. In other words, the defendants have not shown that the plaintiff's claim is incorrect.

The plaintiff represents that "the SEVIS termination was arbitrary and capricious, based solely on an unverified database flag and issued without any explanation." Pl.'s Mem. at 11.

Specifically, he posits that "[t]he termination lacked individualized explanation, relied on vague or irrelevant factors, ignored key facts in the record, and departed from established procedures without justification, all in violation of the APA." Id.[19]  He contends first that "[h]ad ICE engaged in even minimal individualized review, it would have discovered that [the p]laintiff entered into a negotiated plea and did not sustain any criminal conviction that would trigger adverse immigration consequences[.]" Id. at 12.  Second, he notes that "ICE cited generic codes like 'identified in criminal records check' and 'failure to maintain status,' even though [the p]laintiff had no criminal conviction and was lawfully employed under valid STEM OPT at the time." Id.  Third, the plaintiff alleges that the defendants terminated his SEVIS record in violation of its own rules and procedures.  Id. at 13 (citing United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260 (1954)).  And finally, the plaintiff represents that "[t]he simultaneous termination of thousands of SEVIS records, en masse, [seemingly] without notice, individualized inquiry, or any adherence to governing procedures, reflects the opposite of reasoned enforcement." Id.  (emphasis omitted).

The defendants insist that they "had a rational reason for" their termination of the plaintiff's SEVIS record.  Defs.' Suppl. Opp'n at 15.  They explain that "[h]ere, ICE terminated [the plaintiff's] SEVIS record, noting that his visa had been revoked[,]" id., and "[t]hat information was accurate, and it was reasonable for ICE to share it with [the plaintiff's] school in connection with a termination of [his] SEVIS record because it shows that [he] is subject to removal proceedings[,]" id. (citing 8 U.S.C. § 1227(a)(1)(B)).  And, they further represent that

---

[19] The plaintiff also notes that the defendants' termination of his SEVIS record occurred within the broader context of the April 2025 DHS and ICE "Student Criminal Alien Initiative[,]" through which "thousands of international students across more than 180 institutions lost their legal status" within the span of a few weeks.  Compl. ¶¶ 40–47.

the plaintiff's "authorization to engage in his OPT automatically terminated with the initiation of his removal proceedings[.]" Id. at 16.

The APA requires a rational connection between the facts, the agency's rationale, and the ultimate decision. Nat'l Council of Nonprofits, 763 F. Supp. 3d at 55. Here, the Court agrees with the plaintiff that, "when an agency disregards clear, material facts and fails to articulate any legitimate basis for its decision, it cannot satisfy even deferential review under the APA." Pl.'s Mem. at 12. The Court fails to appreciate how the defendants could possibly have engaged in an individualized review of each of the numerous students whose SEVIS records they terminated within such a short span of time, and here the plaintiff is arguably correct that he "did not sustain any criminal conviction that would [have] trigger[ed] adverse immigration consequences" at the time of his record termination. Id. In fact, the plaintiff's visa revocation was not grounds for termination until the defendants issued a new policy weeks later.[20] The defendants "also ignored significant reliance interests in deciding to" terminate hundreds, if not thousands, of SEVIS records "on such a massive scale." Nat'l Council of Nonprofits, 763 F. Supp. 3d at 55. The plaintiff had not yet received a notice to appear for his removal proceeding when his SEVIS termination occurred, and he was also actively employed in his training-related employment at that time. He, like other students in similar cases, was reliant on his training for the maintenance of lawful status in the United States and for his income. Terminating his SEVIS record before he even had the opportunity to defend himself against removal, and without any notice to him or a clear, reasoned explanation for that decision, was likely both arbitrary and capricious agency

---

[20] To reiterate, at the time the plaintiff's SEVIS record was terminated, the new SEVIS termination policy was not yet in effect. At that time, "once admitted, visa revocation did not terminate status or authorize SEVIS termination, because the student was permitted to continue the authorized course of study." Compl. ¶ 26 (citing ICE Policy Guidance 1004-04, Visa Revocations (June 7, 2010); Compl. Ex. B (ICE Policy Re Visa Revocations and SEVIS), ECF No. 1–2). The defendants justify their termination of the plaintiff's SEVIS record based on a post-hoc application of the new policy, which the Court considers arbitrary and capricious.

action.  Therefore, at this stage, the plaintiff shown that he is likely to succeed on the merits of his arbitrary and capricious claim.

B.      **Whether the Plaintiff has Sufficiently Alleged Irreparable Injury**

The Court next turns to the question of whether the plaintiff has sufficiently alleged irreparable injury.  In order to establish irreparable injury, a party must meet a "high standard[.]" England, 454 F.3d at 297.  The alleged injury "must be both certain and great[,]" "actual and not theoretical[,]" and "of such imminence that there is a 'clear and present' need for equitable relief."  Id. (quoting Wis. Gas Co. v. Fed. Energy Regul. Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).  Furthermore, the alleged injury "must be beyond remediation"; in other words, the party alleging irreparable injury must establish that there is no " possibility [of] adequate compensatory or other corrective relief . . . at a later date . . . [which would otherwise] weigh[] heavily against a claim of irreparable harm."  Id. at 297–98. (quoting Wis. Gas Co., 758 F.2d at 674).Id. at 297–98. (quoting Wis. Gas Co., 758 F.2d at 674).  Importantly, "obstacles [that] unquestionably make it more difficult for the [plaintiff] to accomplish [his] primary mission . . . provide injury for the purposes . . . [of establishing] irreparable harm."  League of Women Voters of the U.S. v. Newby, 838 F.3d 1, 9 (D.C. Cir. 2016).  "For some, these are harms for which 'there can be no do over and no redress.'"  Nat'l Council of Nonprofits, 763 F. Supp. 3d at 57 (quoting Newby, 838 F.3d at 9).

Generally, "economic loss does not, in and of itself, constitute irreparable harm[,]" Wis. Gas. Co., 758 F.2d at 674.  More specifically, "[t]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury."  Davenport v. Int'l Bhd. of Teamsters, AFL-CIO, 166 F.3d 356, 367 (D.C. Cir. 1999) (quoting Sampson v. Murray, 415 U.S. 61, 90 (1974)).

"Economic harm may qualify as irreparable, however, 'where a plaintiff's alleged damages are unrecoverable.'" Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Rsrv. Sys., 773 F. Supp. 2d 151, 180 (D.D.C. 2011) (quoting Sterling Com. Credit—Mich., LLC v. Phoenix Indus. I, LLC, 762 F. Supp. 2d 8, 16 (D.D.C. 2011)); see Nat'l Mining Ass'n v. Jackson, 768 F. Supp. 2d 34, 53 (D.D.C. 2011) (Walton, J.) (noting that while "the mere fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm," the "recoverability of monetary losses can, and should, have some influence on the irreparable harm calculus"). But, even where economic loss is irretrievable, "the loss 'must . . . be serious in terms of its effect on the plaintiff.'" Cal. Ass'n of Priv. Postsecondary Schs., 344 F. Supp. 3d, at 170 (quoting Gulf Oil Corp. v. Dep't of Energy, 514 F. Supp. 1019, 1026 (D.D.C. 1981)).

Here, the plaintiff represents that, "[a]lthough this Court ordered the restoration of [the p]laintiff's SEVIS record, and [the d]efendants reinstated it on May 10, 2025, the threat of irreparable harm remains real and imminent." Pl.'s Suppl. Br. at 12. Specifically, "[the p]laintiff [states that he] has been unable to return to his pre-termination employment . . . [,] as his former employers declined to rehire him—at least in part, he believes, due to perceived instability in his immigration status[.]" Id. The plaintiff further represents that "[t]he [defendants'] April 26, 2025[,] policy also leaves [the p]laintiff exposed to ongoing harm. That policy expressly authorizes SEVIS termination based on a visa revocation 'with immediate effect,' and permits the government to re-terminate [the p]laintiff's SEVIS record at any time, including the moment this Court's temporary injunction is lifted." Id. Furthermore, the plaintiff contends that "the consequences of the SEVIS termination are not erased simply because [the p]laintiff's record was later reinstated . . . . In [the p]laintiff's case, the SEVIS record likely reflects a termination

lasting over a month," id., and "even brief lapses on the record can jeopardize employment,

travel, and future immigration eligibility[,]" id. at 13.[21]  Finally, the plaintiff represents that he

> also continues to suffer serious financial, emotional, and psychological harm as a
> direct result of the SEVIS termination.  Since losing his job, he has been unable to
> meet rent and other living expenses.  He [also] reports ongoing insomnia, anxiety,
> fear of detention, and emotional distress, all of which are corroborated in his
> sworn affidavit.

Id.

The defendants do not address the plaintiff's alleged irreparable injury in either their

opposition to the plaintiff's original motion for a preliminary injunction, see generally Defs.'

Opp'n, or their opposition to the plaintiff's supplemental brief, see generally Defs.' Suppl.

Opp'n.

In his reply, the plaintiff represents that, in addition to the allegations set forth in his

complaint and supplemental brief, "the existence of status gaps" in his SEVIS record "and the

potentially irreparable immigration consequences that may result" could mean that, "[w]ithout

resolution of those gaps, [the p]laintiff remains vulnerable to future denials of benefits, including

applications for work authorization, status changes, and immigrant and nonimmigrant visas."

Pl.'s Suppl. Reply at 13.

During the August 1, 2025, status hearing, the defendants also made the point that the

plaintiff's claims about not being able to obtain work reauthorization without an active SEVIS

record were irrelevant because the commencement of removal proceedings terminated his work

authorization and essentially precludes him from further work authorization.  The defendants

cited 8 C.F.R. § 274a.14 in support of their position.  However, that statute includes an important

---

[21] It is for this reason that the Court will Order that the defendants reinstate the plaintiff's SEVIS record to active
status, retroactive to the date of its initial termination.  In other words, in response to this preliminary injunction, the
defendants shall both reinstate the plaintiff's SEVIS record to active status and remove any indication of the record
having originally been terminated.

exception that the defendants failed to acknowledge. Specifically, 8 C.F.R. § 274a.14 states that "[e]mployment authorization granted under § 274a.12(c) of this chapter shall automatically terminate [when] . . . [e]xclusion or deportation proceedings are instituted (<u>however, this shall not preclude the authorization of employment pursuant to § 274a.12(c) of this part where appropriate</u>) . . . ." 8 C.F.R. § 274a.14(a)(1)(ii) (emphasis added). And, § 274a.12(c) explicitly includes "[a] nonimmigrant (F-1) student who" is seeking, for example, post-completion OPT or OPT extension positions. 8 C.F.R. § 274a.12(c)(3)(i). Since the plaintiff appears to fall within this category if his SEVIS record is active, and the outcome of his removal proceeding not being a foregone conclusion, the Court concludes that the defendants, by depriving the plaintiff of the very record he needs to demonstrate to potential employers that he falls within the previously noted statutory exemption as an F-1, nonimmigrant student and reapply with USCIS for work reauthorization with an OPT employer, have irreparably harmed for the plaintiff. In other words, the defendants appear to misrepresent that once removal proceedings are initiated, that action categorically precludes the plaintiff from working. But, the regulations on this point suggest otherwise for noncitizen F-1 students in the plaintiff's circumstances. In addition to the impediment to the plaintiff's ability to secure a job offer and pursue work reauthorization as an F-1 student created by the removal proceedings themselves, the Court is concerned that the defendants have unreasonably created an additional impediment by terminating the plaintiff's SEVIS record because doing so renders him unable to qualify under the F-1 student exemption. And, if the plaintiff could otherwise qualify under this exception, his removal from SEVIS creates an impediment to him obtaining employment independent from the restriction resulting from the initiation of removal proceedings. As the record at this stage seems to indicate, the plaintiff's only method whereby he could have his alleged irreparable harm remedied is through

having his SEVIS record restored and pursuing work reauthorization through the F-1 student

exemption to 8 C.F.R. § 274a.14, as articulated in § 274a.12(c).

As noted earlier, the plaintiff represents that he is a national of Bangladesh who sought

legal entry into the United States by working with his consulate to obtain an F-1 visa and gaining

admission to an American university and subsequent training-related employment.  See Compl.

¶¶ 51–55.  The plaintiff further represents that his university, as part of its obligations associated

with enrolling and hosting foreign students, maintains SEVIS records on all such students while

they are lawfully studying or working in the United States.  See id. ¶¶ 20–23, 59; 8 C.F.R. §

214.2(f)(5)(i).  The plaintiff asserts that ICE terminated his SEVIS record and that the plaintiff's

university and its employers allegedly responded to that termination by revoking his

authorization to work.  See Compl. ¶¶ 59, 69–71.  The plaintiff represents that if he cannot work

or study, then he cannot remain in the United States legally, and he also cannot support himself

and his wife.  The plaintiff also claims that any lapse in his lawful status in the United States

could require him to pursue anew the entire process for lawful readmission to the United States if

he wishes to complete his training, and he could face opposition in that process due to such a

lapse, even if he is not ultimately ordered removed by the immigration judge overseeing his

removal proceedings.  In other words, the plaintiff alleges that, if he did, in fact, accrue unlawful

time in the United States following the initial termination of his SEVIS record, that time will

likely work against him should he attempt to initiate the process to lawfully return to the United

States in order to complete his training, and that might prevent him from doing so.  Moreover, he

states that he desires to mitigate the financial loss he has suffered by seeking renewed work

authorization, but he cannot do so lawfully without an active SEVIS record, thus arguably

rendering his economic loss irretrievable.  And, he contends, any gap in his SEVIS record could

allegedly both make his lawful status look unstable to potential employers and also render him unable to pursue further training in the United States.

In light of the plaintiff's representations, and without definitive information to the contrary from the defendant, the Court concludes that "adequate compensatory or other corrective relief . . . at a later date" will be insufficient to remedy the plaintiff's alleged injuries. England, 454 F.3d at 297–98.  Furthermore, if the defendants' actions being challenged by the plaintiff render him unable to complete his educational training, absent a removal order from the judge overseeing his removal proceedings that would remove the plaintiff from the United States entirely, the Court deems that consequence to be a "harm[] for which 'there can be no do over and no redress.'"  Nat'l Council of Nonprofits, 763 F. Supp. 3d at 57 (quoting Newby, 838 F.3d at 9).  Therefore, the Court concludes that, based on the current record, the plaintiff has satisfied his burden to show irreparable harm.

### C.    Balance of Equities and Public Interest

Finally, the Court turns to whether the balance of equities and public interest weigh in favor of granting the plaintiff a preliminary injunction.  The balance of equities and the public interest factors "merge when the Government is the opposing party."  Nken v. Holder, 556 U.S. at 418, 435 (2009); see also Pursuing Am.'s Greatness v. Fed. Election Comm'n, 831 F.3d 500, 511 (D.C. Cir. 2016) (noting that the equities and public interest are "one and the same" when the government is a non-moving party).  And, "[t]here is always a public interest in prompt execution of removal orders[,] . . . and that interest may be heightened by circumstances such as a particularly dangerous alien, or an alien who has substantially prolonged his stay by abusing the processes provided to him."  Nken, 556 U.S. at 436 (internal citation omitted).

The plaintiff represents that the termination of his SEVIS record by the defendants "has already caused, and continues to cause, significant harm, including disruption of lawful F-1 status, loss of work authorization, and exposure to adverse immigration consequences that may not be remedied after the fact." Pl.'s Suppl. Reply at 13. He also represented orally to the Court, during the May 23, 2025, preliminary injunction hearing, that he is unable to apply for work reauthorization without an active SEVIS record.[22]

The defendants offer little counterbalance on this point; they do not even note the considerations in their favor that the Court noted above. Nonetheless, the Court concludes that the balance of equities and the public interest favors the plaintiff. He has been placed in removal proceedings, but his hearing is scheduled to take place on a future date that has not yet been scheduled. In the meantime, he has not been detained, and the defendants do not suggest that he has been charged with further unlawful behavior. The plaintiff is not challenging his removal proceeding here. However, when someone is a noncitizen and is not able to secure lawful employment, that person is more likely to be in need of taxpayer funds or funds from non-governmental organizations in the form of social services (i.e., housing, food or medical assistance services) for himself and his wife while he remains unemployed. And, the public interest is advanced if individuals permitted to enter the United States on F-1 student visas are not rendered impoverished due to their inability to earn a salary while they await the decision as to whether they are required to leave the country.

---

[22] The defendants responded to this assertion by noting that the plaintiff could still apply for work authorization, even without an active SEVIS record, but when pressed on this point by the Court, it became clear that the defendants were not sincere in this position. Instead, the defendants were essentially proposing that the plaintiff could apply for work authorization without an active SEVIS record in the same way that an attorney could conceivably submit an application for a job opening seeking a surgeon. In other words, one could technically submit an application, but no reasonable medical institution would hire someone without any medical training for a position as a surgeon. The same is true here: the plaintiff can theoretically submit an application for work authorization in the United States, but he lacks the necessary qualification of an active SEVIS record to successfully obtain such authorization.

To reiterate, the plaintiff has lost his training-related employment, and he risks losing any ability to successfully reapply for work authorization without an active SEVIS record.  He also risks accrual of unlawful presence in the United States pending commencement of his removal proceedings.  The outcome of those proceedings is not a foregone conclusion, so while the immigration judge assigned to his removal proceeding could order the plaintiff removed, that judge could also permit him to remain in the United States and continue his training.  Should that happen, and absent reinstatement of the plaintiff's SEVIS record to active status, the plaintiff will have sustained both a serious interruption in the progression of his education and might also have experienced an extensive period of unemployment.  The public interest is also better served by restoring the plaintiff's SEVIS record as active because it would allow him to meaningfully apply for work reauthorization and have a greater chance of obtaining lawful employment while he awaits his removal hearing.  Treating the plaintiff as though he has already been ordered removed before he has had the opportunity to exercise his right to defend himself against removal is putting the cart before the horse.

### D.      Should the Plaintiff be Required to Pose Security under Federal Rule of Civil Procedure 65(c)

Having concluded that the Court should grant in part the plaintiff's requested preliminary injunction, the Court will next discuss whether it should require security under Federal Rule of Civil Procedure 65(c).  Pursuant to Federal Rule of Civil Procedure 65(c), a court granting a temporary restraining order or preliminary injunction must require the movant to pay security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  Here, the plaintiff requests "[t]hat the Court waive any bond requirement under Federal Rule of Civil Procedure 65(c), as [the p]laintiff is an individual of limited means facing imminent harm, and the

requested relief poses no financial risk to the government." Pl.'s Mem. at 3. The defendants ask the Court to "require [the plaintiff] to post a bond." Defs.' Suppl. Opp'n at 16–17. Specifically, the defendants represent that "[t]he risk of harm here is not insubstantial, and if the Court grants . . . preliminary injunctive relief, [the d]efendants respectfully request that the Court require that [the plaintiff] post security during the pendency of the Court's Order, in the event that it is later determined that [the d]efendants were wrongfully enjoined." Id. at 17. The Court declines the defendants' request.

Rule 65(c) "has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond," DSE, Inc. v. United States, 169 F.3d 21, 33 (D.C. Cir. 1999), "including the discretion to require no bond at all," P.J.E.S. ex rel. Escobar Francisco v. Wolf, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (quoting Simms v. District of Columbia, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)). And, a bond "is not necessary where requiring [one] would have the effect of denying [a] plaintiff[ his] right to judicial reviepw of administrative action." Nat. Res. Def. Council, Inc. v. Morton, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases); cf. Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump, 767 F. Supp. 3d 243, 291 (D. Md. 2025) (setting a bond of zero dollars because granting the defendants' requested bond amount "would essentially forestall [the p]laintiffs' access to judicial review"). In a case where the government is alleged to have unlawfully terminated the SEVIS record of a foreign student who commenced his studies in the United States pursuant to an F-1 visa and has not yet had the opportunity to defend himself in his upcoming removal hearing, it would defy logic—and contravene the very basis of this opinion—to hold hostage the plaintiff, who cannot even attempt to earn an income without an active SEVIS record, for the resulting harm of the government's actions. That is especially true when the defendants will not face any personal monetary injury

from the preliminary injunction.  See, e.g., Nat'l Council of Nonprofits, 763 F. Supp. 3d at 48,

50–51, 53–54.

## V.    CONCLUSION

For the foregoing reasons, the Court concludes that it must grant in part and deny in part

the plaintiff's motion for a preliminary injunction.  Specifically, the plaintiff's motion for a

preliminary injunction is granted to the extent it seeks to have the Court Order the defendants to

"immediately and fully reinstate [the plaintiff's] SEVIS record, retroactive to the date of

termination."  Pl.'s Mot. at 2.  The plaintiff's motion is further granted to the extent that it seeks

a prohibition on the defendants taking "any adverse immigration enforcement action against the

plaintiff based on the prior SEVIS termination[.]"  Id. at 3.  The plaintiff's motion is denied

without prejudice in all other respects.


                                                        REGGIE B. WALTON
                                                        United States District Judge